## ARMENIA v. WYER.

### No. 131, Docket 22895.

United States Court of Appeals
Second Circuit.

Argued Jan. 8, 1954.

Decided Feb. 15, 1954.

Charles Alexander, Brooklyn, N. Y., for plaintiff-appellee (William A. Blank, Brooklyn, N. Y., Harry Kalman and Randolph J. Seifert, New York City, on the brief).

William J. O'Brien, New York City, for defendant-appellant (William F. McNulty, New York City, on the brief).

Before CHASE, Chief Judge, CLARK, Circuit Judge, and GIBSON, District Judge.

GIBSON, District Judge.

Defendant, Trustee of The Long Island Rail Road Company, appeals from a District Court judgment awarding plaintiff, Peter J. Armenia, $21,000. after a jury trial in an action under the Federal Employers' Liability Act, 45 U. S.C.A. § 51 et seq., for personal injuries sustained in the course of his employment as a yard brakeman.

Actually the situation in this case is unusual. The plaintiff's amended complaint sought damages for two separate injuries which occurred in the early morning of April 16, 1952; the first injury being sustained about 1:00 a. m. and the second about half an hour later. The jury's verdict awarded $1,000 to the plaintiff for his first injury and $20,000 for his second injury.

The first ground for reversal urged by the appellant is that the defendant's motion to dismiss the first cause of action should have been granted on the ground that the plaintiff failed to show any injuries whatsoever as having been received as a result of the accident. It will be well to state at this time what the evidence in this case discloses as viewed, as it must be, by looking only to the evidence and reasonable inferences which tend to support the plaintiff. Wilkerson v. McCarthy, 336 U.S. 53, 57, 69 S.Ct. 413, 93 L.Ed. 497. Only where there is complete absence of probative facts to support the conclusion does a reversible error appear. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916; Myers v. Reading Co., 331 U.S. 477, 67 S.Ct. 1334, 91 L.Ed. 1615.

On the early morning of April 16, 1952, plaintiff was employed as a yard brakeman by The Long Island Rail Road Company at its 8th Street Freight Yard in Long Island City. This is an extremely large yard. Its terrain is such that at one end of the yard there is what is called the "hump." This "hump" is a hill or a large place of high altitude. To this point freight cars are pushed. From this high point brakemen, under instructions, ride these cars, either singly or in larger groups, down from the "hump" on the momentum gained from the downgrade. At the bottom of this "hump" the yard fans out into twenty-three tracks. The general purpose of the "hump" is to there cut off, piece by piece, a train of cars that comes up the hill and then to classify the cars. Thus, if in a train there were ten New York Central cars, five Pittsburgh and Lake Erie cars, and six Santa Fe cars, as these were ridden downhill they will be switched out onto the appropriate tracks so as to get all of the New York Central cars on one track, the Lake Erie cars on another track, etc.

Sometime about one o'clock in the morning of April 16, 1952, the plaintiff

was instructed to go up onto this "hump" and ride a certain single boxcar down onto Track 16. He was given what is called a "clear alley." In other words, he was told that the tracks were clear to the point where he would be riding that particular car. The plaintiff climbed on top of the boxcar and as he started down the "hump" he approached a switchman who had charge of throwing certain switches so that cars would be properly switched and tracks properly cleared. The switchman, realizing that a car had stopped on the track the plaintiff's boxcar was approaching, as plaintiff approached yelled to the plaintiff, "Bail off." The plaintiff thereupon let go of the brake on top of the boxcar, starting climbing down the ladder on the side of the car and when half way down, jumped. When the plaintiff jumped, he hit the ground very hard, with his hands and feet; his head jolted from the impact. In addition, he received a bruise on his leg. When he arose to his feet, he told a conductor nearby who asked how he was, that he felt all right to continue working.

Within a half hour thereafter, the conductor ordered the plaintiff and another brakeman to shove some cars down Track 9 to the end of the tracks. In this operation there would be an engine which would push four or five cars from the east end of Track 9 to the west end. Plaintiff accordingly climbed to the top of the most westerly car and took his position atop of the car, about at its center. He gave his signal by electric lantern to his fellow brakeman, Patterson, who was on the east end of these cars. He gave him a caution signal because of the poor visibility. It was a foggy, drizzly night. The engine then, on receiving Patterson's signal, started to push and they were proceeding slowly. Plaintiff, during this proceeding, was standing on top, about in the middle of the westerly car on what is called a "catwalk." As the cars were moving slowly, the plaintiff flashed another caution sign to Patterson, when all of a sudden he saw, about a foot in front of him, a low-hanging cable. The cable was perhaps three or four feet above the top of the car. Plaintiff tried to duck away from it, but it hit him on the head and he fell on his back on the top of the car, striking the back of his head on the catwalk.

At the west end of this yard, shortly before the Van Alst Avenue Bridge is reached, there are two cables which are stretched entirely across the twenty-three tracks in the freight yard. The upper cable is the permanent support for the lower or so-called "messenger" cable. The upper or so-called "permanent support" cable is anchored to steel poles located on the northerly and southerly sides of the freight yard. At 240-foot intervals along its length there are steel "droppers" that hang down and are attached to the lower or "messenger" cable. This "messenger" cable is anchored only to the steel pole on the southerly side of the yard. The northerly end of the "messenger" or lower cable passes over a sheave or pulley on the northerly pole and then extends down the side of the pole about fifteen feet, where there is attached to it a counterweight. This counterweight is designed to take up any slack or sag that may develop in this "messenger" cable. To this lower or "messenger" cable, telltales are attached. These telltales were supposed to be so hung as to strike one standing on a freight car in the face, thus warning him to duck for the approaching bridge. It was this lower or "messenger" cable that the plaintiff claimed suddenly loomed in front of him, that he tried to duck—but which hit him on his head and knocked him onto his back on the catwalk of the boxcar.

About a month and a half before April 16, 1952, a freight train rammed into the steel pole on the southerly side of the yard, knocking it down. This pole was then promptly replaced and the whole system inspected and placed in proper working condition. This work was completed by March 5, 1952.

From this accident, or accidents, which occurred on April 16, 1952, the

plaintiff suffered serious personal injury —a cerebral concussion with continuing headaches, dizziness, and blackouts. In addition, the plaintiff suffered incipient epilepsy and lack of ability to concentrate and serious damage to an optical nerve as a result of this accident, or accidents. This condition is of a permanent character.

■■ 1. The appellant's first ground of error—*i. e.*, that plaintiff proved no damage as a result of the first accident, cannot be sustained. The evidence clearly indicates that the plaintiff, when he "bailed off," struck the ground very hard; his head was jolted and he bruised a leg. Furthermore, a well qualified physician who treated the plaintiff over a long period of time testified it was possible plaintiff received a cerebral concussion as a result of his "bail off" and that plaintiff definitely received a cerebral concussion from one of his accidents that morning.

The jury awarded the plaintiff $1,000 for the damages sustained in the first of two accidents. These damages, within limits not here exceeded, are not reviewable. Korte v. New York, N. H. & H. Railroad Co., 2 Cir., 191 F.2d 86. There can be no question but what there was sufficient evidence as to this first accident upon which the jury might find that the defendant was negligent and that this negligence was a proximate cause of the plaintiff's having to "bail off."

■■ 2. Neither did the Court err in not dismissing the action based on the second accident on the grounds that there was insufficient evidence of actionable negligence to justify a verdict for the plaintiff. To recover under the Act, the plaintiff must, of course, show negligence. Moore v. Chesapeake & Ohio R. Co., 340 U.S. 573, 575, 71 S.Ct. 428, 95 L.Ed. 547. The facts and inferences therefrom, viewed in the light most favorable to the plaintiff, show that the plaintiff was working on a dark, dismal, drizzly night in an unlighted freight yard; that while in the conduct of his employment he was stationed atop of the westerly boxcar of a series of four or five freight cars that were being pushed towards the west end of the freight yard; that he was hit by a cable that hung three or four feet above the top of the boxcar upon which he was riding and because he was hit, he was knocked down on top of the freight car, striking his head a severe blow. There is ample evidence from which the jury could find that in fact the cable was drooping as low as the plaintiff claims. The plaintiff so testified, and so did his companion brakeman, Patterson.

The defendant, however, claims that even if that were so (which it denied) there was no evidence that the Rail Road had knowledge, either actual or constructive, that this cable was hanging so low that it did constitute a danger to brakemen riding on top of boxcars. However, the defendant introduced evidence which tended to show that about February 25, 1952, a freight car rammed into and knocked down the steel pole supporting these cables on the southerly side of the freight yard. His evidence showed that at this time this entire cable system had been reassembled and put in working condition again. This work was completed by March 5, 1952. This accident happened in the early morning of April 16, 1952. If the jury found, as they well might, that the cable was in fact hanging that low, then certainly this would constitute a danger to brakemen riding in the dark on a drizzly night on top of its cars. If the lower cable were hanging that low, then surely the pulley—or counterweight—designed to keep this cable taut—must have been out of kilter.

It then became incumbent on the defendant to show that this lower cable had been actually inspected—and that at a time close onto April 16, 1952. Inspection of this cable nearly six weeks before the accident could not excuse it from making inspections thereafter. The defendant had the records; it knew whether or not it had inspected that lower cable at a time closer to the date of the accident than March 5th. The jury might well infer from the status

of the evidence that the defendant was in fact negligent and that it was this negligence that caused the serious physical injury to the plaintiff. Danger from a low-hanging cable at this area was foreseeable. While the southerly end of this so-called "messenger" cable was anchored to a steel pole, the northerly end of this cable passed over a sheave or pulley on the northerly pole and then extended down the side of the pole about fifteen feet, where there is attached to it a counterweight. It certainly seems easily foreseeable that this pulley, or counterweight, might become out of adjustment. When the danger is foreseeable, a railroad's liability is anything but restricted. Lillie v. Thompson, 332 U.S. 459, 462, 68 S.Ct. 140, 92 L.Ed. 73.

Furthermore, the nature of the task that this brakeman undertook, the hazards which it entailed, the need of some kind of light—or not—, the height of the lower cable above the cars, the presence—or lack of—telltales—all these were facts and circumstances for the jury to weigh and appraise in determining the standard of care that an ordinary prudent man would use in like circumstances in operating this freight yard. Bailey, Administratrix v. Central Vermont Railway, Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444.

■ The right to trial by jury is basic in our system of federal jurisprudence. Jacob v. New York City, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166. It is part of the remedy afforded railroad workers under the Employers' Liability Act. What constitutes due care in given circumstances defies definition. The very fact that fair-minded reasonable men reach different conclusions as to what an ordinary prudent man would do under similar circumstances emphasizes the correctness of leaving the question to the jury. To withdraw this question from the jury would be to usurp the jury's functions. Tiller, Ex'r v. Atlantic Coast Line Railroad Co., 318 U.S. 54, 68, 63 S.Ct. 444, 87 L.Ed. 610. We find no error in the Trial Court's failing to dismiss the second cause of action on the grounds that there was insufficient evidence of actionable negligence and there was no error in the Trial Court's refusing to set aside the verdict of the jury on that ground.

■ 3. Nor is there any merit to the defendant's third claim of error. As already pointed out, the plaintiff did receive serious physical injury. The defendant's contention merely goes to the weight of the medical testimony with respect to permanency and possible future effects of the injury. The weight of such testimony has consistently been held to be solely for the jury. Hill v. Pennsylvania Greyhound Lines, Inc., 3 Cir., 174 F.2d 171, 172. Cunningham v. New York Cent. & H. R. R. Co., C.C., 49 F. 439.

Judgment affirmed.