Howard V. BRADSHAW and
Ona Bradshaw

v.

UNITED STATES of America,
Appellant.

Howard V. BRADSHAW and Ona
Bradshaw, Appellants

v.

UNITED STATES of America.

Nos. 23126, 23130.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 30, 1970.

Decided Feb. 11, 1971.

Mr. Robert C. Crimmins, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellant in No. 23,126 and appellee in No. 23,130. Messrs. Joseph M. Hannon, Roger Zuckerman, Nathan Dodell, and Edwin K. Hall, Asst. U. S. Attys., also entered appearances for appellant in No. 23,126 and appellee in No. 23,130.

Mr. Carlton U. Edwards, II, Washington, D. C., with whom Mr. Ralph H. Deckelbaum, Arlington, Va., was on the brief, for appellants in No. 23,130 and appellees in No. 23,126. Mr. Bernard Margolius, Washington, D. C., also entered an appearance for appellants in No. 23,130.

Before McGOWAN, TAMM, and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

A motorcycle policeman (Bradshaw) of the District of Columbia Metropolitan Police Force, while engaged in the performance of his duty on June 13, 1963, was hit and seriously injured by a bus owned by the United States which was being driven at the time on Government business by an employee of the United States. Following a period of hospitalization, Bradshaw attempted to return to work but he was subsequently found by the Board of Police and Fire Surgeons to be permanently disabled, as a result of the above accident, from performing his duties as a police officer and on March 31, 1964 he was retired from the District Police Force under the provisions of D.C. Code § 4–527(1) (1967),[1] the Policemen and Firemen's Retirement and Disability Act (hereinafter the "Disability Act" and "District Disability Act.") In conformance with the provisions of this statute Bradshaw is presently receiving, and will continue to receive during his entire life, 66⅔% of the basic salary he was receiving at the time of his retirement. Pursuant to said statute Bradshaw also received medical and hospital treatment[2] having a value of about $548.

On March 11, 1965, Bradshaw commenced a suit based on negligence against the United States under the Federal Tort Claims Act[3] for $100,000

1. D.C. Code § 4–527(1) (1967) provides:
   Whenever any member is injured or contracts a disease in the performance of duty or such injury or disease is aggravated by such duty at any time after appointment and such injury or disease or aggravation permanently disables him for the performance of duty, he shall upon retirement for such disability, receive an annuity computed at the rate of 2 per centum of his basic salary at the time of retirement for each year or portion thereof of his service: *Provided*, That such annuity shall not exceed 70 per centum [*sic*] of his basic salary at the time of retirement, nor shall it be less than 66⅔ per centum of his basic salary at the time of retirement.

2. D.C. Code § 4–525 (1967) provides:
   Whenever any member shall become temporarily disabled by injury received or disease contracted in the performance of duty, to such an extent as to require medical or surgical services, other than such as can be rendered by the Commissioners, or to require hospital treatment, the expense of such medical or surgical services, or hospital treatment, shall be paid by the District of Columbia; but no such expense shall be paid except upon a certificate of the Commissioners setting forth the necessity for such services or treatment and the nature of the injury or disease which rendered the same necessary.

3. 28 U.S.C. § 1346(b) provides:
   Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

in damages to compensate him for (1) medical services and hospitalization; (2) loss of working time; (3) being required to retire from his job; and (4) for suffering "other losses" which were subsequently specified to include pain and suffering. Ona Bradshaw, his wife, also joined in the suit and claimed damages of $25,000 "for loss of services, society and consortium."

The United States, first in its answer, then in a motion for summary judgment and finally at trial, asserted that the District Disability Act provided Bradshaw's exclusive method of recovery and precluded a suit against the United States under the Tort Claims Act. The trial court held that the existence of the District Disability Act *did not* preclude a suit against the United States under the Tort Claims Act and found that the accident occurred solely through the negligence of the driver of the Government vehicle. However, the court refused to allow Bradshaw to recover for the value of his medical services and in determining the amount of damages resulting from his projected loss of earnings took two factors into consideration. First, it held that Congress had appropriated some of the money for the retirement (disability) fund and to omit all consideration of that fund would result in at least "partial double payment," and, secondly, it held that wooden reliance on the figure of Bradshaw's present earnings projected to his retirement date would, because of unforeseen exigencies and contingencies, be entirely theoretical and unsafe and be a basis that a jury would not be likely to accept.

Following such standards, the court awarded Bradshaw damages of $20,000. We affirm the judgment of the trial court, except we reverse to direct payment also of the value of the medical and hospital services received by Bradshaw.

I.

*The District Disability Act and the Tort Claims Act*

The first issue presented is whether the existence of the benefits available under the Disability Act for the District of Columbia precludes recovery by Bradshaw from the United States under the Federal Tort Claims Act.

Neither the language contained in the exceptions to the Tort Claims Act, 28 U.S.C. § 2680 (1964),[4] nor the one provision of the Disability Act which deals with exclusivity, D.C. Code § 4–538 (1967) (71 Stat. 400)[5] provides an answer to the question of whether the Disability Act precludes a suit under the Tort Claims Act. However, the factual situation presented in the instant case is, for all practical purposes, identical to the one presented to this court in the case of Wham v. United States, 86 U.S. App.D.C. 128, 180 F.2d 38 (1950).[6] There we held that although an injured District of Columbia policeman was entitled to benefits under the District Disability Act, he could nevertheless maintain a suit against the Government under the Federal Tort Claims Act. Questions have arisen concerning whether some of our subsequent decisions and those of the Supreme Court have eroded

---

4. *See* 28 U.S.C. § 2680. Section 2679 contains the exclusivity provision.

5. Policemen and Firemen's Retirement and Disability Act Amendments of 1957, Pub. L. No. 85–157, § 7, 71 Stat. 400, D.C. Code § 4–538 (1967), provides:

    Notwithstanding any other provision of law, no person entitled to receive any benefit under the Policemen and Firemen's Retirement and Disability Act on account of death incurred, an injury received, or disease contracted, or an injury or disease aggravated, in

the performance of duty shall be entitled, because of the same death, injury, disease, or aggravation, to benefits under the Federal Employees' Compensation Act, as amended (5 U.S.C. 751, and the following).

6. The difference between the two cases is that the policeman in *Wham* was injured by an employee of the Treasury Department while Officer Bradshaw was injured by an employee of the Army. The difference is not material to the discussion which follows.

the holding in *Wham* or whether it should still be followed. We conclude that *Wham* is still good law and should be followed here.[7]

In *Wham* we arrived at the result that we did chiefly for two reasons. The first was that the case of Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949) was, in our opinion, directly controlling. In *Brooks*, a soldier on furlough was injured when the private vehicle in which he was riding collided with a Government truck being operated negligently by a Government employee. Though he was covered by various compensation schemes created by the Government, see 337 U.S. at 53, 69 S.Ct. 918, the Court held that the soldier was entitled to maintain an action under the Federal Tort Claims Act for the injuries he received. In discussing the *Brooks* case, we said:

> We think that decision controls this case. Soldiers on furlough fall within the presumption of being in line of duty and, generally speaking, enjoy the same benefits as soldiers on active duty. * * * In principle, claimants in the Brooks cases and the claimant here must stand on an equal footing before the Tort Claims Act. Each is favored with a special system of benefits by reason of his particular employment. Neither is expressly excluded by said Act. So why, if soldiers (on furlough) directly in the federal service are not excluded, should a policeman directly in the employ of the District of Columbia, a municipal corporation * * * be excluded? We can see no reason for such discrimination.

86 U.S.App.D.C. at 129, 180 F.2d at 39.

The Court in *Brooks*, however, left open the possibility, later confirmed in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), that soldiers on furlough and soldiers on active duty and operating directly under orders were distinguishable for purposes of the Tort Claims Act. 337 U.S. at 52, 69 S. Ct. 918. Faced in the latter case with suits under the Tort Claims Act by soldiers who had been injured while acting pursuant to orders, and disturbed over the possible effect on military discipline of suits being maintained for injuries resulting from negligently given orders, the Supreme Court held that no recovery under the Tort Claims Act was possible under such circumstances. It distinguished *Brooks* precisely because the claimant had been on furlough in that case. The lesson to be drawn from a combined reading of *Brooks* and *Feres* is that a suit by a member of the military establishment against the U.S. Government cannot be brought under the Federal Tort Claims Act when the complainant has suffered what might be called a work-related injury and the Government he sues has already provided a "simple, certain and uniform compensation system." (340 U.S. at 144 n. 12, 71 S.Ct. 153). *See* United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954); Hale v. United States, 416 F.2d 355 (6th Cir. 1969); United States v. Lee, 400 F.2d 558 (9th Cir. 1968), cert. denied, 393 U.S. 1053, 89 S.Ct. 691, 21 L.Ed.2d 695 (1969); Feeley v. United States, 337 F.2d 924, 933 (3d Cir. 1964); Snyder v. United States, 118 F.Supp. 585, 595–598 (D.

---

7. The Government urges that the Disability Act now in issue is not the same one as was in issue in *Wham*. Brief for Government at 8 n. 2. It is true that, after the decision in *Wham*, the Disability Act was changed substantially. Policemen and Firemen's Relief Act Amendments of 1957, Pub.L. No. 85–157, 71 Stat. 391, D.C. Code § 4–521 *et seq.* (1967). The principal changes are enumerated in H.R. Rep. No. 530, 85th Cong., 1st Sess. 3–4 (1957). Basically, they provided for benefits to be paid to persons disabled other than in the course of duty and increased the overall amounts of money to be paid to retired persons. The Government does not indicate how these changes are relevant to the instant case and it does not appear that they are. A change in the method of financing the plan was made in 1935 but since that time the basic method has remained substantially the same. See discussion at note 12, *infra*.

Md. 1953). Thus, the *Brooks-Feres* distinction falls into the work related-non work related dichotomy characteristic of workmen's compensation schemes generally. *See* Cobia v. United States, 384 F.2d 711 (10th Cir. 1967); United States v. Browning, 359 F.2d 937 (10th Cir. 1966); Wolff v. Britton, 117 U.S. App.D.C. 209, 328 F.2d 181 (1964).

Since Bradshaw's injuries were obviously work related, *Brooks* has no applicability and that portion of *Wham* which relied on *Brooks* can no longer be considered a correct statement of controlling law as it applies to cases such as the one at bar.

In *Wham,* however, we indicated that a second reason existed for allowing the plaintiff in that case to maintain a suit under the Federal Tort Claims Act, *i. e.:*

> However, independently of the Brooks decision, we think the facts concerning the [Disability Act] Fund suggest no sound basis for the exception read into the Tort Claims Act by the District Court. *In our opinion the United States bears no such relation-*

*ship to the [Disability Act] Fund as to justify the Government's claim for exemption from liability under the Tort Claims Act to appellant by reason of his position as a member of the Metropolitan Police [of the District of Columbia].*

86 U.S.App.D.C. at 129, 180 F.2d at 39 (emphasis added). This is tantamount to holding that the United States cannot successfully assert immunity from suit under the Federal Tort Claims Act because of the existence of available benefits under the District Disability Act since the nature of the relationship of the United States to the District Disability Act is not of such character as to justify immunity from suit.

The above quoted part of our opinion in *Wham* has not been undermined by the subsequent decisions of either this court or the Supreme Court. The District Disability Act, created in 1916[8] by Congress pursuant to its authority to legislate for the District of Columbia[9] is administered by persons appointed by the Commissioner of the District of Columbia,[10] an independent

---

8. Act of September 1, 1916, ch. 433, § 12, 39 Stat. 718. The form of the retirement plan so created remained unchanged, except for financing, until passage of the Policemen and Firemen's Relief Act Amendments of 1957, *supra* note 7. Since the 1957 amendments, the scheme remained unchanged with the exception of several minor modifications until October 26, 1970 when it was amended by Pub.L. No. 91–509, 91st Cong., 2d Sess., 84 Stat. 1136.

  The 1970 amendments increased the employees' contributions from 6½ to 7% of basic salary (D.C. Code § 4–524); increased the rate for computing retirement for disability from 2 per centum of basic salary for each year of service to 2½ per centum (D.C. Code § 4–527); removed the 50-year age requirement for optional retirement after twenty years' service and made a similar change from 2 per centum to 2½ per centum in the rate for computing optional retirement benefits (D.C. Code § 4–528); increased the maximum annuity available from 70 to 80 per centum of basic salary at time of retirement; added a $50,000 lump sum

benefit for the survivor of any member dying whose death results from the performance of duty; increased the benefits for widows; added and improved benefits for surviving children and student children and otherwise increased the disability and retirement benefits available to members.

9. U.S.Const. art. I, § 8 provides:

  The Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States. and the Acceptance of Congress, become the Seat of the Government of the United States * * *.

10. Section 401 of Reorganization Plan No. 3 of 1967, 32 Fed.Reg. 11699 (1967) transferred the functions of the Board of Commissioners with regard to the Disability Act to the Commissioner of the District of Columbia and by Organization Order No. 12, April 6, 1968, the Commissioner organized the Relief Board in its present form.

municipal corporation.[11] The revenues necessary to pay the requisite benefits under the Act come from a combination of revenues derived from District of Columbia taxes, gifts, fines, etc., employee contributions and a federal contribution.[12] The federal contribution is intended to compensate the District

---

11. Act of June 11, 1878, ch. 180, § 1, 20 Stat. 180, D.C. Code § 1–102 (1967) provides:

> The District is created a government by the name of the "District of Columbia," by which name it is constituted a body-corporate for municipal purposes, and may contract and be contracted with, sue and be sued, plead and be impleaded, have a seal, and exercise all other powers of a municipal corporation not inconsistent with the Constitution and laws of the United States and the provisions of this Code.

*See generally* Reorganization Plan No. 3 of 1967, §§ 101(a), 503(a), 32 Fed.Reg. 11669, 11696 (1967); District of Columbia v. Bailey, 171 U.S. 161, 176, 18 S.Ct. 868, 43 L.Ed. 118 (1898); Eckloff v. District of Columbia, 135 U.S. 240, 243, 10 S.Ct. 752, 34 L.Ed. 120 (1890); Metropolitan R. R. v. District of Columbia, 132 U.S. 1, 7, 10 S.Ct. 19, 33 L.Ed. 231 (1889). The District can sue and be sued. Harris v. District of Columbia, 256 U.S. 650, 41 S.Ct. 610, 65 L.Ed. 1146 (1921); Metropolitan R.R. v. District of Columbia, *supra*; Barnes v. District of Columbia, 91 U.S. 540, 23 L.Ed. 440 (1876). The United States is not liable for claims against the District. John McShain, Inc. v. United States, 375 F.2d 829, 831, 179 Ct.Cl. 632; Sweeney v. United States, 285 F.2d 444, 152 Ct.Cl. 516. While most of the legislative power over the District is lodged in Congress, District of Columbia v. John R. Thompson Co., 346 U.S. 100, 111, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953), the District has been granted some power to legislate for itself. Jones v. District of Columbia, 116 U.S.App.D.C. 301, 304, 323 F.2d 306, 309 (1963); La Forest v. Board of Commissioners, 67 App.D.C. 396, 397, 92 F.2d 547, 548 (1937). Employees of the District are not employees of the United States. *See* Donovan v. United States, 21 Ct.Cl. 120 (1886); 20 Op. Atty. Gen. 59, 61 (1898); *cf.* Calomeris v. District of Columbia, 96 U.S.App.D.C. 364, 226 F.2d 266 (1955); Barrett v. Young, 134 F. Supp. 106, 107 (D.D.C.1951); 20 Op. Comp. Gen. 59, 61 (1940). Besides the fact that the "Mayor" and City Council are appointed by the President, Reorganization Plan No. 3 of 1957, §§ 201(b), 301 (b), 33 Fed.Reg. 11669, 11670 (1967), the chief difference between the District and any other municipal corporation without full home rule is that,

> When it legislates for the District [of Columbia], Congress acts as a legislature of national character, exercising complete legislative control as contrasted with the limited power of a state legislature, on the one hand, and as contrasted with the limited sovereignty which Congress exercises within the boundaries of the states on the other.

Neild v. District of Columbia, 71 App. D.C. 306, 310–311, 110 F.2d 246, 250–251 (1940).

12. Initially, there was a separate, identifiable fund in the U. S. Treasury composed of the proceeds of fees and payments related to the Police and Fire Departments such as fines, rewards, gifts, proceeds from sale of unclaimed property and employee payroll deductions and out of which were to be paid all of the benefits required by the Disability Act. If the balance in the fund was at any time insufficient to pay the benefits so required, the Board of Commissioners of the District was authorized to pay into the fund additional sums drawn from the District's general revenues. Act of September 1, 1916, ch. 433, § 12, 39 Stat. 718; *see* Wham v. United States, 86 U.S. App.D.C. at 129, 180 F.2d at 39. In 1924, Park Policemen (federal employees) were placed under the District Disability Act and the sums they received were also drawn from the fund. However, the United States assumed 40% of the cost of all benefits paid. Act of May 27, 1924, ch. 199, § 7, 43 Stat. 176. This arrangement continued until 1934, when the percentage payment plan was abandoned by the Government and the Board of Commissioners were directed to request annually lump sums from the fund in an amount sufficient to cover the estimated cost of the benefits which would be paid pursuant to the Act. Act of June 26, 1934, ch. 756, § 14, 48 Stat. 1230, D.C. Code § 47–109 (1967). The following year, the fund itself was abolished as a separate and identifiable entity. The salary deductions and other revenues formerly required to be deposited in it were ordered to be deposited in the U. S. Treasury to the credit of the general revenues of the District of Columbia. Act of June 14, 1935, ch. 241,

for benefits received by the United States and takes the form of annual lump-sum payments to the District.[13]

49 Stat. 358, D.C. Code § 4–502 (1967). Payments of retirement and disability benefits to District policemen under the Act were to be made, and presently are made, from the general revenues of the District and the District taxpayers therefore contribute the majority of the money so used. *See generally*, 103 Cong.Rec. 8202, 8204 (1957); Hearings on S. 1770 before the Subcommittee on Fiscal Affairs of the Senate Committee on the District of Columbia, 85th Cong., 1st Sess. 70–71 (1957). The Act thus operates on a "pay-as-you-go" rather than on a funded basis. *Compare, e. g.*. D.C. Code §§ 4–502, 4–524 (1967) *with* D.C. Code § 31–721 (1967). Payments made under the Disability Act to federal employees by virtue of D.C. Code § 4–521 (1967) are derived from a combination of payroll deductions from the wages of such employees and a direct federal payment to the District. D.C.Code § 4–537 (1967). Since money is appropriated annually from U. S. revenues in excess of sums credited to the general revenues of the District of Columbia to help defray the expenses of the District, *see* note 13, *infra*; D.C. Code § 47–2501a (Supp. III, 1969), some federal money is included in the money paid to District policemen as benefits received by them under the Disability Act. Wham v. United States, 86 U.S.App.D.C. 128, 130, 180 F.2d 38, 40 (1950). Nevertheless, federal money does not constitute the major share of the money expended by the District of Columbia and thus presumably does not form a major share of the money which is received by beneficiaries of the Disability Act. Since Bradshaw commenced his employment in 1949, the percentage of the federal payment to the general fund of the District has varied as follows:

| Year | % | Year | % |
|------|------|------|------|
| 1949 | 12.79 | 1960 | 12.51 |
| 1950 | 11.19 | 1961 | 11.20 |
| 1951 | 9.43 | 1962 | 12.84 |
| 1952 | 8.58 | 1963 | 11.75 |
| 1953 | 8.80 | 1964 | 14.15 |
| 1954 | 8.52 | 1965 | 12.57 |
| 1955 | 14.33 | 1966 | 13.57 |
| 1956 | 12.57 | 1967 | 15.74 |
| 1957 | 12.86 | 1968 | 15.33 |
| 1958 | 12.04 | 1969 | 16.95 |
| 1959 | 13.45 | 1970 | 17.11* |

\* as recommended in District of Columbia Appropriation Bill for 1970. H. R. Rep. No. 91–680, 91st Cong.,

These payments become a part of the District's general revenues and some of the money included therein undoubtedly

1st Sess. 7 (1969). The 1969 figures were as follows:

Total congressional appropriations for the District of Columbia $527.299,907
District of Columbia share 518,284,000
United States share 107,000,000
Percentage of U. S. share 16.95

6½% of each policeman's and fireman's pay is also withheld, turned over to the District's Collector of Taxes and deposited by him in the U. S. Treasury to the credit of the District of Columbia. D.C. Code § 4–524(1) (1967). This withholding was increased to 7% by Pub.L. No. 91–509, 91st Cong., 2d Sess., 84 Stat. 1136 (1970).

13. Under the Organic Act, Act of September 1, 1878, ch. 180, § 3, 20 Stat. 102, Congress paid 50% of the expenses of the District. The Board of Commissioners of the District annually submitted a statement of estimated expenses to the Secretary of the Treasury, who would review it and make recommendations concerning it. The Secretary would then return the statement to the Board of Commissioners which would transmit both the statement and the Secretary's recommendations to the Congress for approval. In 1920, the ratio was changed, and the United States paid 40% of the District's estimated expenses. Act of June 5, 1920, ch. 234, 41 Stat. 837. Under the Budget and Accounting Act of 1921. ch. 18, §§ 2, 213–16, 42 Stat. 20, 23, as amended, 31 U.S.C. §§ 2, 11, 22–24 (1964) the Board of Commissioners was required to submit its estimate to the Bureau of the Budget, which, after review turned it over to the President for submission to Congress. *See, e. g.*, 114 Cong. Rec. 4237, 4306 (1968). In 1924, a lump sum method of making the annual federal payment was substituted for the percentage formula, Act of June 7, 1924, ch. 302, 43 Stat. 539, and this is the method which is used today. Under Reorganization Plan No. 3 of 1967, 33 Fed.Reg. 11669 (1967), the Board of Commissioners was abolished, § 503, and responsibility for preparation of the budget and submission to the Bureau of the Budget was divided between the Commissioner and Council. § 403. The annual federal payment goes into the general fund of the District of Columbia which consists of the federal payment and the District's revenues on deposit in the U. S. Treasury. *See, e. g.*, Act of November 2, 1966, Pub.L. No. 89–743, 80

is paid to policemen and firemen as part of the benefits they receive under the Act.[14] District policemen and firemen are under the control of the District Police and Fire Chiefs respectively and are not subject to the direction and control of the United States.[15] In sum, the District (a municipal corporation) and not the United States is, in every meaningful sense, the employer of the District policemen and firemen who—along with their dependents—benefit from the District Disability Act. *See* Grace v. Magruder, 80 U.S.App.D.C. 53, 56, 148 F.2d 679, 682 (1945); Standard Accident Ins. Co. v. Hoage, 62 App.D.C. 245, 246, 66 F. 2d 275, 276 (1933); United States v. Griffith, 55 App.D.C. 123, 124, 2 F.2d 925, 926 (1924).

It is in light of the relationship between the Government, the District and Bradshaw that the Government's claim regarding the exclusivity of the District Disability Act must be analyzed. All of the cases which the Government cites for the proposition that the District Disability Act provides an exclusive remedy for Bradshaw deal with situations in which a person engaged or employed *in the service of the United States* was entitled to compensation paid by the United States principally from U.S. revenues under a scheme established and maintained by the United States and was seeking a second method of recovery from the United States in a tort action. Demko v. United States, 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966);[16]

Stat. 1167. The latter are derived chiefly from taxation, see D.C. Code §§ 47–309, 43–126 (1967), but also include such things as the sums withheld from the wages of District policemen and firemen under the Disability Act. D.C. Code § 4–524 (1967). From this general fund come the amounts necessary to defray the expenses of the District. *See* D.C. Code § 47–310 (1967); Act of December 24, 1969, Pub.L. No. 91–155, 83 Stat. 428.

14. In addition to policemen and firemen in the District, U. S. Park Police, the White House police and certain Secret Service employees are covered by the District Disability Act. D.C. Code §§ 4–521(1), (10), 4–522 (1967). The District, however, is reimbursed for amounts paid to such persons under the Act over and above the amounts which they collectively have contributed from their salaries. D. C. Code §. 4–537 (1967). Thus no money which can properly be called District money is used to pay the federal employees. The same arrangement in reverse is used to provide money for benefits paid to District employees covered by the Federal Employees Compensation Act, 5 U.S.C. §§ 8139, 8147(b) (Supp. V, 1969), and the District pays the employer's share for District employees covered by the Federal Employees Retirement Act, 5 U.S.C. § 8334 (Supp. V, 1969). The Park Police have been covered by the Disability Act since that organization was created. Act of May 27, 1924, ch. 199, §§ 4–7, 43 Stat. 175. Presumably they were placed under the Act because the parks over which they had jurisdiction were located almost entirely

within the District and the work they did was comparable to that being done by the District Police. *See* Hearings on S. 1770 before the Subcommittee on Fiscal Affairs of the Senate Committee on the District of Columbia, 85th Cong., 1st Sess. 112, 115 (1957). For many of the same reasons, White House Police and certain Secret Service personnel are included in the Act. *See* Hearings on S. 1770 *supra*, at 121–122. In addition, members of the last two organizations asked to be placed under the Act because the benefits it provided were among the best then available for Government employees. Hearings on S. 1770, *supra*, at 62, 123.

15. Act of June 11, 1879, ch. 180, § 6, 20 Stat. 102; Reorganization Plan No. 3 of 1967, §§ 401, 402(89)–(106), 33 Fed. Reg. 11669, 11671, 11676–11677 (1967); Organization Order No. 153 of 1966. The police department was formerly under the direct control of the Government. Act of August 6, 1861, ch. 62, 12 Stat. 320.

16. Demko was actually employed by Federal Prison Industries, Inc., a District corporation. The Court noted, however, that the corporation was a "governmental body." 385 U.S. at 150 n. 1, 87 S.Ct. 382. The Board of Directors of the corporation includes, among others, the Attorney General and the Secretary of Defense. 18 U.S.C. § 4121 (1964). The Attorney General regulates and administers the compensation scheme which was at issue in the suit. 18 U.S.C. § 4126 (1964). It is difficult, therefore, to consider Demko as anything other than an employee of the United States or at least

4

Johansen v. United States, 343 U.S. 427, 72 S.Ct. 849, 96 L.Ed. 1051 (1952); Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); Lewis v. United States, 89 U.S.App.D.C. 21, 190 F.2d 22, cert. denied, 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653 (1951). *See also* Patterson v. United States, 359 U.S. 495, 79 S.Ct. 936, 3 L.Ed.2d 971 (1959). In none of such cases has recovery in tort been permitted.

The principle in such cases behind denial of recovery from the United States in tort, even in the absence of language in the applicable statute expressly precluding it, was expressed by the Court in *Johansen:*

> As the Government has created a comprehensive system to award payments for injuries, it should not be held to have made exceptions to that system without specific legislation to that effect.

343 U.S. at 441, 72 S.Ct. 849, at 857. Thus the existence of a comprehensive scheme for compensation was felt by the Court to carry with it a presumption that it was the exclusive method of recovery for the injuries which it covered. *See also* Demko v. United States, *supra,* 385 U.S. at 152, 87 S.Ct. 382. The Supreme Court, however, was careful to limit this presumption to the relations between the United States and its employees.[17] Thus limited, the presumption is in harmony with the pattern workmen's compensation schemes have taken on generally: in place of an employer's liability in tort, often leaving employees with no compensation for "industrial" or work-related injuries, there is substituted a fixed and exclusive liability on the part of the employer with the employee's rights against third parties left unaffected expressly or by implication. *See* Weyerhaeuser S.S. Co. v. United States, 372 U.S. 597, 601, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); Brooks v. United States, 337 U.S. 49, 53, 69 S.Ct. 918, 93 L.Ed. 1200 (1949); Bradford Electric Light Co. v. Clapper, 286 U.S. 145, 157–158, 159, 52 S.Ct. 571, 76 L.Ed. 1026 (1932); Dahn v. Davis, 258 U.S. 421, 423–424, 42 S.Ct. 320, 66 L.Ed. 696 (1922); Davis v. Harrod, 132 U.S.App. D.C. 345, 347 n.2, 407 F.2d 1280, 1282 n.2 (1969); S. Rep. No. 836, 81st Cong., 1st Sess. 23 (1949); 1 A. Larson, The Law of Workmen's Compensation § 1.10, at 2 (1968); McCoid, The Third Person in the Compensation Picture: A Study of the Liabilities and Rights of Non-Employers, 39 Tex.L.Rev. 389, 392–394 (1959); *cf.* Lewis v. United States, 89 U.S.App.D.C. 21, 22 n.6, 190 F.2d 22, 23 n.6 (1951).

of a wholly owned "instrumentality" of the United States. The Court seemed to recognize this proposition implicitly, for, besides relying on Johansen v. United States, 343 U.S. 427, 72 S.Ct. 849 (1952), it said of the relationship between the Federal Tort Claims Act and 18 U.S.C. § 4126 (1964):

> Indeed to hold that the 1946 Federal Tort Claims Act was designed to have such a supplemental effect would be to hold that injured prisoners are given greater protection than all *other government employees* * * *.

Demko v. United States, 385 U.S. 149, 152, 87 S.Ct. 382, 384 (1966) (Emphasis added).

17. We have already held that [the Public Vessels Act of 1925, 46 U.S.C. §§ 761 *et seq.*] grants consent to be sued for personal injuries suffered by an individual not employed by the United States * * *. If the congressional purpose was to allow damages for personal injuries sustained by federal employees while in the performance of duty, the literal language of the Act would allow actions of the nature of those before us. Johansen v. United States, 343 U.S. 427, 431, 72 S.Ct. 849, 852 (1952).

In [the Federal Employees Compensation Act] Congress undertook to provide a comprehensive compensation system for federal employees * * *.
*Id.* at 432, 72 S.Ct. at 853.

Had Congress intended to give a crew member on a public vessel a right of recovery for damages against the Government beyond the rights granted *other* Government employees on the same vessel * * * we think that this advantage would have been specifically provided.
*Id.* at 440, 72 S.Ct. at 857 (emphasis added). *See also* United States v. Demko, 385 U.S. 149, 150 n. 2, 152, 87 S.Ct. 382 (1966); Patterson v. United States, 359 U.S. 495, 496, 79 S.Ct. 936 (1959).

Aubrey v. United States, 103 U.S. App.D.C. 65, 254 F.2d 768 (1958) does not depart from this general pattern. There the plaintiff was an employee of a U.S. Naval Officers' Mess, a non-appropriated fund activity. He was injured in the course of his employment through the alleged negligence of personnel in the United States Navy, and was compensated under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (1964), which, by virtue of 5 U.S.C. § 8171 (Supp. V, 1969), applies to all employees of nonappropriated fund activities. Aubrey then commenced a suit against the Government under the Federal Tort Claims Act, and in that decision, while acknowledging that he was not an "employee" of the United States, we held that the Longshoremen's and Harbor Workers' Compensation Act nevertheless provided his exclusive remedy.[18]

Aubrey, however, was not considered to be an employee of the United States for certain purposes only, primarily for the purposes of the Civil Service and Federal Employees Compensation Acts. *See* 5 U.S.C. § 2105(c) (Supp. V, 1969); Denenberg v. United States, 305 F.2d 378, 158 Ct.Cl. 401 (1962). He worked for an instrumentality of the United States, 5 U.S.C. § 2105(c) (Supp. V, 1969); *see* Nimro v. Davis, 92 U.S.App. D.C. 293, 204 F.2d 734, cert. denied, 346 U.S. 901, 74 S.Ct. 229, 98 L.Ed. 401 (1953), and was therefore presumably an employee of the United States for purposes of unemployment compensation, 5 U.S.C. § 8501 (Supp. V, 1969), or, in the absence of special legislation, for purposes of the Federal Employees

Compensation Act. United States v. Forfari, 268 F.2d 29, 33 (9th Cir. 1959). He worked under regulations promulgated by the Secretary of the Navy, 10 U. S.C. § 6011 (1964), and was subject to the control of Naval personnel in all facets of his job. Aubrey v. United States, *supra,* 103 U.S.App.D.C. at 68, 254 F.2d at 771. In short, he was not considered to be an employee of the United States for narrowly circumscribed statutory purposes, *see* Daniels v. Chanute A.F.B. Exchange, 127 F.Supp. 920, 924 (E.D. Ill.1955), and under such circumstances the presumption that the compensation scheme provided by statute was his exclusive remedy was in harmony with the normal effect of such compensation schemes on the relations between employers and employees generally.

Because Bradshaw is not an employee of the United States, however, the presumption found in the above cases is not applicable to his suit against the United States, and nothing those cases contain undermines the second ground of our decision in *Wham.* Nevertheless, since *stare decisis* is not an inflexible rule, *see, e. g.,* Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940), the result dictated by *Wham* should be examined to determine whether it still fits into the system of remedies created by statute as part of a workable, consistent and equitable whole. Johansen v. United States, *supra,* 343 U.S. at 432, 72 S.Ct. 849.

The task is somewhat complicated by the multiplicity of sources from which Government employees may obtain compensation and by the complexity of the provisions governing the administration

---

**18.** Congress amended 5 U.S.C. § 150k–1 (1952) shortly after the decision in *Aubrey* in order to reach the result by legislation which the court had reached by implication. *See* Act of July 18, 1958, Pub. L. No. 85–538, § 1, 72 Stat. 397, 5 U.S.C. § 8173 (Supp. V, 1969). One reason for the exemption of non-appropriated fund employees from civil service and employee compensation laws is the expense of administration.

Since installation population is subject to rapid changes it is necessary to oper-

ate exchanges to meet existing needs. At times it is necessary to employ and release workers on a daily basis. Subjecting these employees to the laws pertaining to civil service would be a definite handicap to both these workers and the employing agency and would retard recruitment and add to the administrative burden of the operation.

H. R. Rep. No. 1995, 82d Cong., 2d Sess. 4 (1952).

of the various benefit plans. Beginning with certainties, Park Policemen, White House Policemen and Secret Service personnel covered by the Disability Act cannot recover from the United States in tort for damages or expenses which, in one way or another, are compensable under its provisions. As employees of the United States for whom their employer has provided a "simple, certain and uniform compensation system," they are subject to the presumption of exclusivity announced in *Johansen, Demko* and *Feres. See* Lewis v. United States, 89 U.S.App.D.C. 21, 190 F.2d 22 (1951). This is true despite the fact that these employees, and particularly the Park Police, do much the same work as the Metropolitan Police. *See* 103 Cong.Rec. 14329 (1957).

From here, the waters become less clear. Employees of the District of Columbia, *other than policemen and firemen,* are covered by the provisions of the Federal Employees Compensation Act. 5 U.S.C. § 8101(1) (D) (Supp. V, 1969). The cost of such compensation paid to District employees under the Act is borne by the District, *see* 5 U.S.C. § 8147(b) (c) (Supp. V, 1969), and payment to such District employees is made in the same manner as are the general expenses of the District, 5 U.S.C. § 8139 (Supp. V, 1969); *see. e. g.,* 82 Stat. 695 (1968). But, unlike District policemen and firemen, other District employees can receive specified payments for specified injuries under the Act. 5 U.S.C. § 8107 (Supp. V, 1969). In addition, while eligibility for recovery under the Federal Employees Compensation Act would seem to preclude any recovery in tort against the United States by a District employee for the same injury, 5 U.S.C. § 8116(c) (Supp. V, 1969), the matter is not free from doubt. Moreover, under the Federal Employees Retirement Act, 5 U.S.C. § 8301 *et seq.* (Supp. V, 1969) an injured District employee (other than a policeman or fireman) who is eligible for compensation under the Federal Employees Compensation Act, if he has been employed for five years or more, and if he has become disabled, can, instead of his benefits under the Compensation Act, elect to receive his benefits under the Retirement Act. 5 U.S.C. §§ 8337(a), (f), 8339(a), (f) (Supp. V, 1969). The Retirement Act contains no exclusivity provision whatsoever, and, since each employee contributes to the fund from which benefits are paid, 5 U.S.C. § 8334 (Supp. V, 1969), receipt of, or eligibility for, benefits under its provisions does not appear to preclude recovery in tort against the United States. *Cf., e. g.,* United States v. Price, 179 F.Supp. 309 (E.D.Va.1959), aff'd, 288 F.2d 448 (4th Cir. 1961).

In light of the different provisions of the District Disability Act, the Federal Employees Compensation Act and the Retirement Act, the interpretation of the one which would promote the greatest amount of equity and consistency in the remedial schemes for all District employees is perhaps impossible to find. In addition to the difficulty of the task, it appears that Congress has made its own choice on the matter and did not "intend" that the compensatory scheme provided for policemen and firemen and those provided for other District employees would be entirely consistent. An attempt to make them so would thus run directly counter to the congressional purposes in their enactment.

We come to this conclusion because, during the debates which preceded the passage of the Policemen and Firemen's Relief Act Amendments of 1957, Pub.L. No. 85–157, 71 Stat. 391, D.C. Code § 4–521 *et seq.* (1967) (hereinafter 1957 Amendments), congressional sponsors of the bill stated that the Metropolitan Police Force was having difficulty obtaining and retaining its authorized quota of members and that an improved pension plan might remedy that situation. 103 Cong. Rec. 14324 (1957); *see* Hearings on S. 1770 before the Subcommittee on Fiscal Affairs of the Senate Committee on the District of Columbia, 85th Cong., 1st Sess. 2 (1957). In addition, a limited exclusivity provision was placed in

the Act.[19] This was done after we had decided the *Wham* case, nine years after a broader exclusivity provision had been placed in the Federal Employees Compensation Act,[20] and one year before a broad exclusivity provision was added to the sections dealing with employees of non-appropriated fund activities.[21] In addition, the limited exclusivity provision in the District Disability Act was inserted at the request of the Bureau of the Budget to provide "clarification of any doubtful areas which might later be the subject of interpretation unless made clear by substantive legislation."[22] Thus, even in light of the principle that one should be wary of finding any congressional purposes in congressional silence, Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 241–242, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the problems posed by possibilities of dual recovery under compensation schemes can hardly have been unfamiliar to the Congress and what it failed to prohibit expressly, this court should be reluctant to find it prohibited by implication.

■ In sum, whether allowing Bradshaw to maintain this action under the Federal Tort Claims Act would be equitable and consistent in light of the compensation schemes for other Distict employees and federal employees who are covered by the District Disability Act, besides being a difficult question to answer, is perhaps an irrelevant question in light of the legislative record of the District Disability Act. The Congress created the Act and in this particular case it is in a better position to provide the equity and consistency which it feels to be requisite than is this court. Thus, there is nothing which compels the court to abandon the holding in *Wham*,[23] and, on that basis, the decision of the trial court to permit Bradshaw to maintain the instant action should be affirmed. Doing so absolves the driver of the truck from suit (28 U.S.C. § 2679(b)) and in the event that Congress considers it improper to subject the United States to suit in such a case, a simple amendment to the District Disability Act would accomplish that result.

## II

### *The Collateral Source Rule*

The second issue presented here is whether the collateral source rule is available to a police officer of the District of Columbia in a tort suit against the United States. In issue is the value of Bradshaw's medical and hospital expenses which were paid by the District of Columbia in accordance with the provisions of the District Disability Act,[24] and Bradshaw contends he is nevertheless entitled under the collateral source rule to recover their value from the United States.

The trial court made no finding of fact concerning the amount of medical and hospital expenses which had been paid, but said that there was evidence that $548 had been so expended. The court however held that Bradshaw was not entitled to recover for this item, saying:

The Court is of the opinion that the Collateral Source Rule, as formulated in the decision of the Court of Appeals in Hudson v. Lazarus, 95 U.S. App.D.C. 16, 217 F.2d 344 is not applicable, because in this case the collateral source is not a third party but a fund established by an appropriated [*sic*] of funds. In other words, it is

19. *See* note 5, *supra*.

20. Federal Employees' Compensation Act Amendments of 1949, ch. 691, § 201, 63 Stat. 861, 5 U.S.C. § 8116(c) (Supp. V, 1969).

21. Act of July 18, 1958, Pub. L. No. 85–538, 72 Stat. 397, 5 U.S.C. § 8173 (Supp. V, 1969).

22. S. Rep. No. 669, 85th Cong., 1st Sess. (1957) ; Hearings on S. 1770, *supra*, at 22.

23. When *Wham* was argued in 1949 the federal payment constituted 12.79% of total District revenues. In 1963 when Bradshaw was injured the federal payment was 11.75%. In 1969 it was 16.-95%. *See* note 12, *supra*.

24. *See* note 2, *supra*.

the defendant's money which paid his medical and hospital bills.

Joint Appendix at 52.

■ We find that this disposition was erroneous. As the preceding discussion has established, it was not the defendant's money which was used to pay the hospital bills. *Compare* Adams v. Turner, 238 F.Supp. 643 (D.D.C.1965). Most of the money came from District revenues and employee contributions. This court has applied the collateral source rule and allowed recovery in the past in similar situations, Hudson v. Lazarus, 95 U.S.App.D.C. 16, 217 F.2d 344 (1954), as have other courts. *See* Burke v. Byrd, 188 F.Supp. 384 (N.D.Fla. 1960). *See generally* Restatement of Torts § 920, comment (e) (1935); C. McCormick, Handbook of the Law of Damages § 90, at 310, 323–324 (1935); Schwartz, The Collateral-Source Rule, 41 B.U.L.Rev. 348 (1961); Comment, 38 Mich.L.Rev. 1073 (1940). Recovery of the value of the medical and hospital expenses should therefore be allowed here and the case should be reversed and remanded for a determination of the amount.

Bradshaw also claims that he is entitled to the present value of his future lost earnings computed without giving any consideration to the amounts which he will receive as part of his benefits under the District Disability Act. There was expert testimony that the present value of his loss of earnings from the date of his involuntary retirement[25] to the date at which he would have been subject to mandatory retirement[26] from the police force would be $91,000. If the amounts which he could expect to receive under the Disability Act were taken into account, the amount of his future loss of earnings would be $1,600.

■ The trial court declined to award Bradshaw the $91,000, saying, first of all, that the collateral source rule did not apply since the amounts paid under the Disability Act for retirement were paid by the defendant. Secondly, the court held that the $91,000 figure was too speculative, did not take into account "possible trials and tribulations of life and * * * unforeseen exigencies and circumstances," and therefore probably would not be used by a jury as an accurate measure of damages for future lost earnings. The court therefore awarded Bradshaw $20,000.

The first ground for denial of the award, like the ground on which the recovery of medical expenses was denied, was error.[27] The second ground, however, cannot be said to be clearly erroneous and must therefore be upheld. Fed.R.Civ.P. 52(a).

Bradshaw argues that it was error for the trial court not to have accepted the unrebutted testimony of his expert witness as to the amount which he would have earned until the date of his mandatory retirement, and to discount such testimony because of its speculative nature. In support of this contention, he cites cases which stand for the proposition that future loss of earnings, though speculative, can nevertheless be ascertained and awarded as damages.

■ Bradshaw's authorities do not go so far as to say that the speculative na-

25. Bradshaw retired from the police force on August 1, 1964 under D.C. Code § 4–527 (1967), because of a disability incurred while performing duty. *See* Joint Appendix at 35.

26. Policemen may be retired at age sixty at the discretion of the head of the police department. D.C. Code § 4–528(2) (1967).

27. Since the retirement benefits under the Disability Act are paid partially by employee contributions, there is a serious question concerning whether sums paid under the Act would fall outside the collateral-source rule even if such sums were considered as emanating from the defendant. *See* Feeley v. United States, 337 F.2d 924, 934 (3d Cir. 1964); United States v. Harue Hayashi, 282 F.2d 599 (9th Cir. 1960); Jennings v. United States, 291 F.2d 880 (4th Cir. 1961); United States v. Gallops, 207 F.2d 48 (5th Cir. 1953); United States v. Price, 179 F.Supp. 309 (E.D.Va.1959), aff'd, 288 F.2d 448 (4th Cir. 1961). In view of the propriety of the District Court's alternate ground of disposition of this issue, the issue presented by the above-cited cases need not be reached.

ture of estimates of future loss of earnings cannot be taken into account in making an award. The ultimate fact to be found is the amount of money which Bradshaw will lose because of the accident and the amount which he might have earned but for the accident is evidence on, and not a determination of, that question. The trier of fact is not required to use any particular formula in computing the amount of the loss. *See* Culley v. Pennsylvania R.R., 244 F. Supp. 710, 716–719 (D.Del.1965); *cf.* Frankel v. Todd, 393 F.2d 435 (3d Cir. 1968); McWeeney v. New York, N. H. & H. R.R., 282 F.2d 34, 36 (2d Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L. Ed.2d 93 (1960). *See generally* C. McCormick, Handbook of the Law of Damages § 86 (1935). Moreover, the weight to be accorded even unrebutted expert testimony is for the trier of fact to determine. Hawkinson v. Johnston, 122 F.2d 724, 731 (8th Cir.), cert. denied, 314 U.S. 694, 62 S.Ct. 365, 86 L.Ed. 555 (1941); Merrill v. United States, 177 F.Supp. 704, 705 (S.D.N.Y.1959); *see* Luria Bros. & Co. v. United States, 177 Ct.Cl. 676, 369 F.2d 701, 713–714 (1966); Armenia v. Wyer, 210 F.2d 592, 596 (2d Cir. 1954); Brill v. Mushinsky, 90 U.S. App.D.C. 132, 194 F.2d 158 (1952). We accordingly find that the trial court did not commit reversible error in failing to award Bradshaw the full present value of his future loss of earnings as that value was calculated by his expert witness.

### III

#### Adequacy of the Award

Bradshaw does not press heavily his contention that the damages awarded were inadequate in view of the nature and extent of his injuries. In his complaint the *ad damnum* was $100,000 of which $91,000 was for future loss of earnings. An award of $20,000 could

include $11,000 for lost earnings as well as the $9,000 for pain, suffering, etc. originally requested. While Bradshaw was found to be totally disabled under the procedures of the District Disability Act from performing his duties as a policeman that conclusion was not determinative of the extent of his general disability. He might still be able to perform work other than as a policeman and the evidence so indicated. In the four calendar years following his retirement he earned an average per year of $4,038 (Tr. 31–34). He was also receiving a minor amount of compensation from the Veterans' Administration for a prior service-connected disability equal to 10 per cent of total disability or about $23 a month [28] at the time the trial court entered the judgment in this case. While $11,000 is not overly generous it is not a clearly erroneous award and the trial court should therefore be affirmed. *See* Old Dominion Stevedoring Corp. v. Polskie Linie Oceaniczne, 386 F.2d 193 (4th Cir. 1967).

### IV

#### Conclusion

We conclude that the trial court was correct in allowing Bradshaw to maintain this action against the United States; and that the court did not commit reversible error in determining the award for loss of future earnings;[29] but that it was error to refuse to allow recovery for the value of his medical and hospital expenses.

The court's judgment to the extent that it refuses recovery for the value of medical and hospital expenses is vacated and the case is remanded to the District Court to determine the value of such expenses and to include such amount in the judgment.

It is so ordered.

---

28. Compensation in this amount for 10% disability was provided by 38 U.S.C. § 314(a) (Supp. V, 1969) (82 Stat. 808).

29. In this context the comments by the court concerning the collateral-source rule were harmless error. *See* Owens v. White, 380 F.2d 310 (9th Cir. 1967).