Eleanore Higginbotham ARETZ, Plaintiff,

v.

UNITED STATES of America, Defendant.

Thomas F. ARETZ, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 1158, 1159.

United States District Court, S. D. of Georgia, Brunswick Division.

Aug. 30, 1978.

Charles H. Wessels, Frank P. Brannen, Brannen, Wessels & Searcy, Savannah, Ga., for plaintiffs.

William T. Moore, Jr., U. S. Atty., Savannah, Ga., Edmund A. Booth, Jr., Asst. U. S. Atty., Augusta, Ga., Darci L. Rock and James P. Klapps, Tort Section, Civ. Section, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

LAWRENCE, Senior District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN ACTIONS BY THOMAS F. ARETZ AND MRS. ARETZ

### I

### BACKGROUND OF LITIGATION

On June 30, 1977, this Court found that under the Federal Tort Claims Act the United States is liable as a joint tortfeasor for the injuries arising out of the explosion at the plant of Thiokol Chemical Corporation at Woodbine, Georgia on February 3, 1971. The disaster resulted in the death of twenty-nine employees and injuries to more than fifty other employees.

The liability issue was determined before hearing any of the numerous individual claims for damages. On July 5–6, 1978, the case of Thomas F. Aretz and his wife was tried without a jury at Brunswick. It was the first claim filed and therefore the first tried.

The delay between the decision as to liability of the United States and the trial of the damage feature is not attributable to this Court. During the interim the record of the trial on the liability feature was at last transcribed by a new reporter; the Government considered for some months the matter of an interlocutory appeal, which was disallowed, and extensive discovery in Aretz' claim was completed. A direct appeal to the Fifth Circuit by the

Government will be in order after the ruling on damages in the present case.

## II

## THE EXPLOSION

Under a contract with the Army, Thiokol was engaged in 1971 in the manufacture of trip flares used by the military forces in the Viet Nam war as an aid to troops subjected to attack at night.

On February 3, 1971, around 60 employees of Thiokol were working in or near Building M–132 in which the flares were produced. At 10:53 A.M. a fire broke out at the "first fire" addition station in the facility. The loose illuminant material (magnesium and sodium nitrate) burns at a speed measured in milli-seconds and reaches very high temperatures. The fire in question ran down the ignition pellet assembly line and eventually got into the cure room where 8,000 pounds of loose illuminants were being cured in trays. Also in the curing room were 56,322 candles containing approximately 0.3 pounds of illuminant each; 18,472 ignition pellets, and 100 pounds of first fire and intermediate mix.

An enormous pressure built up as the result of the deflagration of the illuminants. The fire culminated in an explosion in the cure room that destroyed the building.

Among the injured was Thomas F. Aretz, who with his wife, subsequently filed a suit against the United States under the FTCA.

It will be better to let Mr. Aretz tell in his own words what happened. He testified:

"The area I was in, the conveyor belt was running along in through here, and like this, and there was a stand here, and my position was to stand here and check these candles as they went by. There was an openway, a hallway, leading through here to the far side of the building, where there was another operation going on, and it was through this hallway area that I first became aware of the fire in the area of the pellet ejector. . . . I asked or told the women to please exit—to start to exit the building, and one of the girls, I asked her to turn on the water hose that was put there to help put out a fire from time to time, and that is what I did. I tried to put out the fire. . . . To turn on the water and just . . . was just a matter of seconds. Very, very short. . . . I realized in very short time that it was a fire completely out of control. . . . I exited the building. . . . Well, I turned and I ran out of the building, and . . . the area that I was working in here, and off along through the back was a porch area that was screened in, where there were a lot of candles and things on pallets that were sitting there, and I started out through that door, and to my left was the oven or curer, or whatever you want to call it, and it exploded. . . . [T]he next thing I can remember—I thought I was lying in a huge crater of some kind, not knowing exactly where I was. But a year later, I did find out where I was—within roughly 175 feet of that across the road, and I was in a ditch there." Tr. 111–113.

## III

## DAMAGES UNDER GEORGIA LAW

### Pain and Suffering

Georgia law governs the award and measure of damages in this field. The various categories and elements of damages recoverable by Mr. Aretz are summarized below.

▉ Pain and suffering is a generic name for several types of damages falling under that head, including mental and physical pain and suffering, past, present and future. The measure of damage in such cases is the enlightened conscience of impartial jurors. The award for future pain and suffering does not have to be reduced to present cash value. *St. Paul Fire & Marine Insurance Company v. Dillingham,* 112 Ga.App. 422, 424, 145 S.E.2d 624.

The term "pain and suffering" covers disfigurement and deformity. *Ableman v. Ormond,* 53 Ga.App. 753, 187 S.E. 393; *Fulton Bakery Incorporated v. Williams,* 37 Ga. App. 780, 141 S.E. 922; *Langran v. Hodges,* 60 Ga.App. 567, 4 S.E.2d 489.

■ Impairment of ability to work and labor belongs to this category. Damages therefor are recoverable independently of the pecuniary loss in the way of future earnings. *Chancey v. Shirah,* 96 Ga.App. 91, 99 S.E.2d 365; *Hunt v. Williams,* 104 Ga.App. 442, 122 S.E.2d 149; *Railway Express Agency, Inc. v. Standridge,* 68 Ga. App. 836, 24 S.E.2d 504.

Anxiety or worry proximately attributable to an injury is recoverable. So is mental distress caused by impairment of the enjoyment of life. *Underwood v. Atlanta & West Point Railroad Company,* 105 Ga. App. 340, 124 S.E.2d 758, 218 Ga. 193, 126 S.E.2d 785.

### Special Damages

■ The necessary and required hospital, medical and other expenses consequent upon the negligence of another party are recoverable. Ga.Code Ann. § 105–2004; *Gillis v. Atlantic Coast Line Railroad Company,* 52 Ga.App. 806, 184 S.E. 791. Loss of past earnings is recoverable as special damages from the time of injury to date of trial. See "Jury Instructions, Civil," prepared by Council of Superior Court Judges, pp. 77–78.

■ Loss or diminution of future earning capacity represents special damages. In any such award various considerations must be looked to, including life expectancy, the possibility of diminution of earnings by advancing age or illness, etc. The gross total of the average annual earnings over plaintiff's life span must be reduced to its present cash value by some appropriate method. *Wright v. Lail,* 219 Ga. 607, 135 S.E.2d 418; *Jones v. Hutchins,* 101 Ga.App. 141, 113 S.E.2d 475; *United States v. Varner,* 400 F.2d 369, 373 (5th Cir.).

### Loss of Consortium

■ A wife may recover for the loss of her husband's consortium, including services, society, companionship and affection. *Brown v. Georgia-Tennessee Coaches, Incorporated,* 88 Ga.App. 519, 77 S.E.2d 24; *Bailey v. Wilson,* 100 Ga.App. 405, 408, 111 S.E.2d 106; 15 *Encyclopedia of Georgia Law,* § 49, pp. 63–64. The right of the wife in that respect exists only during the joint lives of the spouses and a recovery for future loss of consortium is based on the shorter of the two expectancies. *Walden v. Coleman,* 105 Ga.App. 242, 124 S.E.2d 313; *Cody v. Peak,* 113 Ga.App. 676, 149 S.E.2d 521. The measure of damages is the reasonable value of the loss as determined by the enlightened conscience of an impartial jury. Awards for future deprivation of consortium (as distinguished from past deprivation) are subject to reduction to present cash value. *Central Truckaway System, Inc. v. Harrigan,* 79 Ga.App. 117, 127, 53 S.E.2d 186.

## IV

## CHRONOLOGICAL HISTORY OF INJURIES AND TREATMENT

Mr. Aretz sustained severe and permanently disabling injuries. Much of the bone in the right humerus was destroyed by magnesium burns. Two sequestrectomies (surgical removal of dead bone) were performed. The right arm could not be saved. In 1972 it was amputated.

Mr. Aretz sustained severe magnesium burns in the posterior calf of his left leg resulting in a large compound wound, almost denuded of flesh. The wound was excised in an operation. A skin graft was later made.

There was compound fractures in the lower left leg requiring an operation. A Steinman pin was inserted. It was removed in a subsequent operation. Mr. Aretz walks with a limp and with considerable difficulty. He uses a cane.

The nerve in the left leg was destroyed resulting in causalgia (a condition accompanied by burning pain due to injury to a

peripheral nerve). An operation known as a sympathectomy (resection or interruption of sympathetic nerve pathways) was done to reduce the pain.

The left eardrum of Mr. Aretz was ruptured in the explosion. In June, 1972 a mastoidectomy and tympanoplasty (surgical reconstruction of hearing mechanism of middle ear) was performed and a skin graft made to replace the eardrum.

As a result of the fractures of the left leg, the foot had to be restructured and pins placed through the toes to correct what was called a "dropped foot syndrome." The operation was performed in 1978.

The foregoing represents only part of the injuries sustained.[1] A chronological summary of the treatment and various operations follows:

| | |
|---|---|
| February 3, 1971 | Multiple operations at Glynn-Brunswick Hospital in Brunswick on arm, leg and head injuries |
| March 12, 1971 to March 13, 1971 | Meningitis attack |
| March 16, 1971 | Skin graft operation |
| March 17, 1971 | Meningitis related convulsions |
| April 1, 1971 | Discharged from Glynn-Brunswick Hospital and admitted to Baptist Memorial Hospital, Jacksonville, Florida |
| April 4, 1971 | Consultation for ear problems |
| April 8, 1971 | Sequestrectomy of right distal humerus and closed reduction of comminuted fracture of left distal tibia and fibula |
| July 23, 1971 | Consultation as to urinary tract infection |
| August 23, 1971 | Sequestrectomy and debridement of osteomyelitis of right humerus |
| October 6, 1971 | Consultation and treatment of seborrheic dermatitis (yellowing and flaking of skin) |
| October 15, 1971 | Dismissed from Baptist Memorial Hospital |
| June 19, 1972 | Readmitted |
| June 22, 1972 | Left mastoidectomy and tympanoplasty performed |
| June 25, 1972 | Discharged |
| October 12, 1972 | Readmitted |
| October 16, 1972 | Amputation of right arm below shoulder |
| November 9, 1972 | Discharged from Baptist Memorial |
| August, 1973 | Consultation in connection with causalgia |
| August 31, September 4, and September 9, 1973 | Lumbar sympathetic blocks |
| October 21, 1973 | Admitted to St. Lukes Hospital |
| October 22, 1973 | Left lumbar sympathectomy performed |
| October 25, 1973 | Brachial block |
| October 27, 1973 | Discharged from St. Lukes |
| April 10, 12, 15, 17, 19, 22, and 24, 1974 | Acupuncture treatments |
| June 9, 1978 | Readmitted to St. Lukes for operation on left foot and toes |
| June 23, 1978 | Discharged from St. Lukes Hospital |

## V

## OVERVIEW OF MEDIAL EVIDENCE

At this point a review in conspectus of the testimony of some of the physicians who treated or operated on plaintiff will be useful.

At the trial Dr. Arthur R. Hagen, an orthopedic surgeon in Brunswick, testified that upon Aretz' discharge from Glynn-Brunswick Memorial in April, 1971, "the wound about the right upper extremity was serious, and I didn't expect him to ever have any function from the elbow. . . The leg also was serious. He had the loss of a lot of muscle, primarily the muscle in the back of the leg. . . . So, I wouldn't give him too good a prognosis. He would have considerable difficulty from either extremity. He could even possibly even lose one or the other, or both of them. (Tr. p. 49). In the discharge summary, March 29, 1971, the same orthopedist stated that "[T]he right upper extremity drained copiously for the first two to three weeks patient was in the hospital. . . . The left lower extremity developed loss of skin over the posterior aspect of the calf. . ." Pl.Ex. 1, (Vol. I). After the skin graft to the left leg, Dr. Hagen noted that "The patient tolerated the procedure well and was returned to the recovery room in satisfactory condition." The skin graft was about 70% effective. Pl.Ex. 1, (Vol. I).

In April, 1971, Dr. John. T. Hocker, an orthopedic surgeon in Jacksonville, reported that Mr. Aretz "remains seriously ill with his right arm immobilized in a left leg cast,

1. A fractured thumb and a broken rib.

both of these windowed for wound care." His general impression was "Multiple wounds, healing, secondary to blast trauma, with compound comminuted fracture of right elbow and humerus, compound comminuted fracture of left tibia and fibula, multiple burns, chronic infection and perforation of left middle ear." Pl.Ex. 3, (Vol. III). Dr. Hocker testified that he initially believed "that it would be better to not be too vigorous on any surgical aspects of this until we were sure that he was going to live." (Tr. p. 185).

A mastoidectomy and tympanoplasty was performed in June, 1972 by Dr. Stanton Hudman, an ear, nose, and throat specialist from Jacksonville. The ear condition was "Secondary to a traumatic perforation of the left ear drum." Pl.Ex. 3, (Vol. II). "Mr. Aretz had a severe hearing loss in the left ear . . .." Dep. p. 11. The discharge summary indicates that the left ear was healing well. Pl.Ex. 3, (Vol. II). Although the operation improved Mr. Aretz' hearing, Dr. Hudman deposed that Mr. Aretz "has a 20 per cent hearing impairment remaining." Dep. p. 13.

Plaintiff's right arm had to be amputated on November 16, 1972. Dr. Hocker stated that Mr. Aretz "has a flail elbow with the substance of the elbow joint being absent, the fingers of the right hand are fusiform and are fixed in extension." Pl.Ex. 3, (Vol. I). "Postoperatively, the patient did well, wound healed per primam, and he was sent to physical therapy . . . .." Pl.Ex. 3, (Vol. I). However, he suffered from the phantom pain syndrome in which "the brain still thinks that the nerve conduction fibers are still there." (Tr. p. 197). Dr. Hocker testified that "I'm not sure we're ever going to get rid of this type of pain." (Tr. p. 204). He concluded that Mr. Aretz, taking all factors into consideration, is seventy to eighty per cent disabled. (Tr. p. 202).

Dr. Harold E. Snyder, a cardiovascular and thoracic surgeon from Jacksonville, first saw Mr. Aretz in August, 1973. He treated him for causalgia, "a sort of reflex situation where the sympathetic nerves are overactive, and severe burning pain is mediated via these nerves." (Dep. p. 8.) He referred plaintiff to Dr. William F. Yost, Jr., an anesthesiologist, to perform a lumbar sympathetic block which is the injection of an anesthetic into the area of the sympathetic nerves. It was successful, but relief was only temporary.

Dr. Snyder performed a lumbar sympathectomy on October 22, 1973. At first, he thought the result of the operation was good although Mr. Aretz was still taking medication for the pain. In February, 1974, he dismissed plaintiff from his care. "I felt that as far as relief of the pain of the causalgia that we probably had improved his condition about 80 per cent. . . . I was pleased with the result at that time." Dep. p. 12. Mr. Aretz testified that he still has discomfort but that the sympathectomy was a "great help." (Tr. p. 126).

In June, 1978, Dr. Hocker operated on Mr. Aretz' left foot in order to straighten the toes. "They're stiff, and what I was trying to do is get them out of the stiff, abnormal position, and put them in a stiff better position." (Tr. p. 195). "I don't expect and never intended, for the operation to improve his mobility of any of those joints." (Tr. p. 219). He testified that the operation "put the toes and the foot in a better position to function. And, if it works, why, you know, he should be free of some of that pain. But I don't know that he is going to be completely pain-free." (Tr. p. 204).

## VI

## COLLATERAL SOURCE DEFENSES

The Government seeks a set-off or deduction from any FTCA award of all payments received by Mr. Aretz under the veterans benefits laws for disability caused by his injuries. The payments in question are for disability not service connected. 38 U.S.C. § 521.

The United States also contends that the medical and hospital expenses and the disability compensation paid under the Georgia Workmen's Compensation Act which plaintiff sues for in his own right are not

recoverable. It says (a) that as contributions or payments by a joint tortfeasor (Thiokol) which were not derived from a collateral source, they should be credited to the United States against the award, and (b) that to permit plaintiff to have a double recovery of the expenses constitutes the imposition of punitive damages which are expressly prohibited by the Federal Tort Claims Act, 28 U.S.C. § 2674.

I discuss these contentions below.

### (A)

### DEDUCTIBILITY OF VETERANS DISABILITY BENEFITS

■ Federal decisional law makes it quite clear that non-service disability benefits received by veterans are not a collateral source of income and are deductible from awards in actions brought under the Federal Tort Claims Act. *Steckler v. United States,* 549 F.2d 1372, 1379 (10th Cir.); *Brooks v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (dictum); *United States v. Brooks* (on remand), 176 F.2d 482, 486 (4th Cir.); *United States v. Gray,* 199 F.2d 239, 244 (10th Cir.).

Mr. Aretz testified at the trial that he received $350.00 a month. He admitted that the VA Form exhibited to him showed that he received $348.08 per month. Counsel for defendant has furnished in its brief (p. 7) a computation of such payments through August 31, 1978, and its correctness has not been challenged. The tabulation is reproduced below with the addition by the Court of the totals of such monthly and annual benefits:

| | Per month | Annually | Less 10%[2] |
|---|---|---|---|
| Jan. 1, 1978, to Aug. 31, 1978 | $ 348.08 | $ 4,176.96 | $ 3,770.26 |
| Jan. 1, 1977, to Dec. 31, 1977 | 328.56 | 3,942.72 | 3,548.45 |
| Jan. 1, 1976, to Dec. 31, 1976 | 295.32 | 3,543.84 | 3,189.46 |
| Jan. 1, 1975, to Dec. 31, 1975 | 268.68 | 3,224.16 | 2,900.94 |
| Jan. 1, 1974, to Dec. 31, 1974 | 28.00[3] | 336.00 | 0.00 |
| Jan. 1, 1973, to Dec. 31, 1973 | 178.40 | 2,140.80 | 1,926.72 |
| Jan. 1, 1972, to Dec. 31, 1972 | 180.98 | 2,171.76 | 1,954.58 |
| April 27, 1971, to Dec. 31, 1971 | 185.00 | 1,480.00 | 1,332.00 |
| TOTALS | $1,813.02 | $21,016.24 | $18,622.41 |

Monthly payments of $348.08 for the remainder of plaintiff's life, reduced to present cash value at 7%, amount to $39,-047.40. Future payments during the estimated balance of plaintiff's life (fifteen years) ordinarily would be deductible by the United States from the FTCA award, subject to reduction to present value. It must be borne in mind, however, that these benefits do not constitute a vested right during a recipient's lifetime. Under 38 U.S.C. § 521(c)(3), no pension may be paid "to any veteran if the annual income of such veteran exceeds $5,070." Another section of the Veterans Benefits Act provides that "The Administrator shall deny or discontinue payment [when] . . . it is reasonable that some part of the corpus [of the veteran's estate] be consumed for the veteran's maintenance." § 522.

■ Should Mr. Aretz place the net proceeds of his award in interest bearing accounts or Government securities, his annual income will exceed such maximum. In any event, it is reasonable that some part of the corpus be used for maintenance.

In *Cooper v. United States,* 313 F.Supp. 1207, 1211ff (D.Neb.), former Chief Judge Robinson was confronted with the same

---

**2.** The defendant concedes that 10% of each monthly disability payment is attributable to service connected disability and that no deduction will be allowed for such amount.

**3.** The figure of $28.00 represents only service connected disability. Apparently, the Government believed that Mr. Aretz was receiving too much income from Social Security and work-

men's compensation to entitle him to non-service connected benefits. The issue was resolved in favor of Aretz, and non-service disability payments were resumed in 1975. Because this amount is for a service connected disability unrelated to the explosion, the Government is not entitled to any deduction therefor.

problem in a tort claims case. The award made by him against the United States totalled approximately $140,000. Relying on 38 U.S.C. § 522, it was held in that case:

> "As the Court interprets the statutes granting non-service connected disability benefits, specifically § 522 of Title 38, United States Code, there is a strong probability that benefits accruing to plaintiff after January 1st, 1971 will be substantially reduced, if not completely stopped, because of the large increase in plaintiff's net worth as a result of securing this judgment. Therefore while this Court will reduce the award in this case in the amount of the Veteran's Benefits already received, approximately Fourteen Thousand Dollars [$14,000.00], any benefits which could be received after January 1st, 1971 will in all probability be reduced substantially or terminated because of the substantial rise in net worth as a result of this judgment. Under the *Brooks* rule then future Veteran's benefits will not be given any consideration by the Court in determining the amount of the award because of the very strong probability that the benefits will and should be terminated."

There is no question that the V.A. disability payments to date amounting to $18,622 are deductible by the United States. As noted, on the basis of a 15-year life expectancy, the future payments of disability benefits during such period, as reduced to present value at 7%, would amount to $39,-047.40. As to future benefits, I am of the view that continued payment of disability benefits is highly speculative and should not be considered. How long a man will live is also a dicey thing at best.

This Court is convinced that the most equitable solution is to allow a further credit to the Government of V.A. payments up to the time of the satisfaction of the judgment in this case. When (and if) it is satisfied, the benefits paid to plaintiff between September 1, 1978, and the date of satisfaction may be set-off by the Government from the amount of the award to Mr. Aretz.

### (B)

### DEDUCTIBILITY OF PAYMENTS OF COMPENSATION AND MEDICAL EXPENSES BY THIOKOL TO PLAINTIFF

*Deduction for Workmen's Compensation Benefits*

The Government argues that it is entitled to set-off the amount paid by Thiokol to Mr. Aretz for disability and medical payments under the Georgia Workmen's Compensation statute. The contention is based on the theory that this Court ruled that the United States and Thiokol were joint tortfeasors.[4]

 Under the law of this State, payment by a joint tortfeasor in exchange for a covenant not to sue is a pro tanto satisfaction of the recovery against other tortfeasors. *Atlantic Coast Line R. Co. v. Ouzts,* 82 Ga.App. 36, 60 S.E.2d 770. Defendant argues that "the payments made by the joint tortfeasor, Thiokol, on account of plaintiff's injuries should be deducted from any damages awarded plaintiff against the United States." Trial Brief, p. 10. The Government recognizes the rule that an employer is not a joint tortfeasor for purposes of contribution. See *Georgia Power Company v. Diamond,* 130 Ga.App. 268, 202 S.E.2d 704. However, defendant contends that the decisions to that effect are inapposite because the Court did not take into consideration the collateral source rule.[5] It argues that failure to set-off these

---

**4.** "The United States was also negligent and its independent acts of negligence concurred with that of Thiokol. They were joint tortfeasors under Georgia law." Opinion, June 23, 1977, p. 68. See also pp. 53, 58, 62, and 67. Of course, Thiokol is not a party to this action and is not bound by such ruling.

**5.** The record is barren of evidence as to the amount of the disability payments pursuant to the Act. The burden of proof in that respect rested on defendant. Under the law as it existed at the time of the explosion, the maximum recovery therefor was $17,000. As to medical and hospital expenses paid on behalf of Thiok-

amounts would result in a double recovery by Aretz, and constitute punitive damages.

We have here a head-on collision between two principles of law which up to now had travelled along different tracks—that of contribution from a joint tortfeasor and the collateral source rule. Under Georgia law, a tortfeasor is entitled to contribution from a joint tortfeasor. Ga. Code Ann. § 105–2012. On the other hand, payments to an injured party from a collateral source do not diminish the liability of a tortfeasor. *Thompson v. Milam,* 115 Ga. App. 396, 154 S.E.2d 721. In *Williams Bros. Lumber Company v. Meisel,* 85 Ga.App. 72, 68 S.E.2d 384 the question was "whether [the employer] could be considered as not being a tortfeasor as to the plaintiff and yet be considered as a joint tortfeasor as to the defendants for the purpose of taking advantage of a payment of compensation under the workmen's compensation law as between its 'joint tortfeasor,' [the employer], and the plaintiff." 85 Ga.App. at 74–75, 68 S.E.2d at 388. The Court's answer was in the negative. It said that nonliability in such situations "is one of the benefits that is granted to an employer coming under the Act and compensates for the many instances where the employer must pay compensation for an injury for which he would not have been liable at common law." 85 Ga.App. at 75, 68 S.E.2d at 388. The Court recognized that under the Act the employer was subrogated to the extent of the compensation payments to the recovery by the employee against a negligent third party. It explained that to allow a defendant to deduct from a jury verdict the amount of workmen's compensation benefits could subject the injured employee twice to accounting for such compensation payments.

Because an employer cannot be a joint tortfeasor, workmen's compensation benefits are regarded as payments from a collateral source. The rationale for treating them as such "is founded on the fact that there is a right of subrogation in the insurance carrier and, therefore, no double recovery." *Feely v. United States,* 337 F.2d 924, 931 (3rd Cir.) (applying Pennsylvania law). See *Williams Bros. Lumber Company v. Meisel, supra,* 85 Ga.App. 72, 68 S.E.2d 384. In the latter case, the Court of Appeals held that a joint tortfeasor is not entitled to a jury instruction that the award should be reduced by the amount of workmen's compensation benefits. Employers "cannot be considered as joint tortfeasors with the third-party, whether or not the employer's negligence combined with that of a third party to produce the employee's injuries." *Georgia Power Company v. Diamond,* 130 Ga.App. 268, 202 S.E.2d 704.

The holdings in those cases might, on the face of things, appear to settle the question. However, there is an important factor to be considered in this case. By an amendment to the Workmen's Compensation Act in 1972 effective July 1st of that year, the General Assembly outright repealed the section conferring the right of subrogation to the employer in case of a recovery by an employee from a third party. *Ga.Laws,* 1972, pp. 3–4. See Ga.Code Ann. § 114–403.

The Government argues that because the right of subrogation—which was the chief concern of the Court of Appeals in *Williams Bros.*—no longer exists, the argument that an injured employee may have to account twice for the benefits paid is not valid. In other words, the employee will have a double recovery unless the United States is allowed to deduct the benefits paid to and for Mr. Aretz.

If a right to subrogation by the employer did not exist, this argument might have some foundation. Under the law in existence at the time of the explosion the exercise of that right required written notice by the employer to the person against whom the employee has a third-party claim. Ga.Code Ann. § 114–403. But

ol, there is reference in the briefs to payments amounting to $53,000. It was paid by Aetna Insurance Company. See Aretz testimony, Tr. p. 129f. I am informed outside the record that the total is now $56,724.74 and that the insurer declined to make further payments when Aretz refused to subrogate it against the United States.

this right evaporated with the repeal of the subrogation provision effective some eighteen months after Mr. Aretz was injured. If proper notice were given prior to its repeal, the right of subrogation became a vested one which was not impaired by the subsequent legislative repeal. *Spengler v. Employers Commercial Union Insurance Co.*, 131 Ga.App. 443, 206 S.E.2d 693; *Aetna Insurance Company v. Windsor*, 133 Ga. App. 159, 210 S.E.2d 373.

There is nothing in the record showing whether notice was given under the statute. The Government's trial brief (p. 12) states that "Thiokol did not assert its recoupment rights prior to the [expiration?] date of the old statute." Nor did Aetna.

The rule permitting an injured employee to be compensated twice for the same expense and its windfall result is a harsh one. But under the authorities this Court can reach no other conclusion than that the payment of the medical and hospital expenses fall within the collateral source doctrine and allow double compensation in this case. See *Bradshaw v. United States*, 143 U.S.App.D.C. 344, 443 F.2d 759.

### Double Recovery of Expenses as Punitive Damages

The Government argues that to permit a dual recovery by Aretz of the medical and hospital expense in effect results in imposition of punitive damages on the United States prohibited by the Tort Claims Act. 28 U.S.C. § 2674. In support of that contention defendant cites *Hartz v. United States*, 415 F.2d 259 (5th Cir.). In that case the Fifth Circuit held that recovery under the Georgia Wrongful Death Act of more than the loss sustained by the survivor is punitive within the meaning of FTCA prohibition against such damages.

■ As related to the case before this Court, I find *Hartz* neither apposite nor persuasive. Under Georgia law, punitive or additional damages may be recovered where there are aggravated circumstances in the tort, including malice, wilfulness, wantonness or conscious indifference to the consequences of conduct. Ga.Code Ann.

§ 105–2002. The federal common law rule is no different. *Nader v. Allegheny Airlines, Inc.*, 167 U.S.App.D.C. 350, 374, 512 F.2d 527, 551, reversed on other grounds 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643. The fact that damages are accumulated or enhanced does not in itself render them penal. *In re Kight*, 88 F.Supp. 42 (N.D., Ala.).

■ The complaint here seeks punitive damages neither by name nor in substance. I quite agree that effect rather than nomenclature is what counts. But I do not agree that the recovery of workmen's compensation and collateral source expenses is interdicted by the prohibition against punitive damages in FTCA.

### VII

### WORK RECORD AND EARNINGS; HEALTH AND MARITAL HISTORY

Mr. Aretz was born on October 9, 1917, and at the time of his injury was 53 years old. His life expectancy was then 21.25 years. He is now sixty and has a life expectancy of 16.12 years. See Commissioners 1958 Standard Ordinary Mortality Table. (Pl.Ex. 16).

Aretz completed the ninth grade in high school. He then performed several odd jobs until entering the Army in 1940 and served in the South Pacific theatre for five years. He contracted malaria and apparently receives approximately $28.00 per month as the result of a 10% service connected disability. His family physician, Dr. George A. Anderson, testified that in 1959 he was hospitalized for arthritic symptoms and the following year for a bleeding ulcer. They responded to treatment. Dep. pp. 9–10. Prior to 1971 he suffered, according to Dr. Anderson, only from occasional flareups of his arthritic condition. p. 29. Mrs. Aretz testified that before the injury her husband had "very wonderful health, and he was a very active, vital person; very energetic, very ambitious." (Tr. p. 64). Mr. Aretz testified that his prior health had been good. (Tr. p. 132).

He had started out as a diamond setter in New York City. He then established a partnership in the jewelry business that continued for two or three years.

He and Mrs. Aretz were married in 1954. They purchased some land in Florida and went into the business of selling eggs. It folded in 1968 due to the competition from large feed companies. At that time plaintiff got employment with Thiokol. The joint tax return of the couple for 1968 shows an adjusted gross income of $1,445 and in 1970, $9,406. Aretz' own income that year was approximately $8,250. (Pl.Ex. 10).

In 1968 they opened a small convenience store on a highway adjacent to the property. Mrs. Aretz ran the business while her husband worked at Thiokol. He helped in the early morning and in the evening. The venture was not very successful. Between 1968 and 1971, it showed a total net profit of approximately, $1,400. (Pl.Ex. 10).

After obtaining employment at Thiokol in 1968 as a laborer, plaintiff received "periodic raises and better jobs as [he] went along." He testified that he had "a promotion coming up within a matter of a few days after I was injured." Tr. p. 109. At the time of the explosion, Mr. Aretz was working in Quality Control in the building in which the trip flares were produced. At that time he was earning $165 to $170 per week. Tr. p. 110.

Mrs. Aretz was born on August 9, 1917, and is now 60 years old. She has a life expectancy of 16.12 years, according to the table referred to. She testified that hers was "just about a perfect marriage that anyone could dream of. . . . [W]e did many nice things together. . . . He enjoyed golfing, and [we liked] swimming, fishing, croquet, golfing, walking on the beach, shelling. . . ." Tr. p. 64. Mr. Aretz testified as to his inability to have sexual congress. Tr. p. 132.

## VIII

### LOSS OF PAST AND FUTURE EARNINGS

There is little doubt by this Court that up to the present Mr. Aretz is totally disabled as far as performing work is concerned. Nor can I foresee any significant change in the future. Defendant's expert witness on vocational rehabilitation, Ron Younse, testified as to the successful program established at Jacksonville for job placement of handicapped persons. He stated that there were job opportunities in work such as collecting tolls at parking lots, serving as a security guard at a gate for observing people entering and leaving and similar sedentary job openings for disabled people. Tr. 395. It strikes me, however, that work opportunity of the described nature is quite slim for a sixty year old man as disabled as is Mr. Aretz.

Both economists who testified computed the loss of earnings from February, 1971 on the basis of total disability to work and labor. Dr. Ralph H. Blodgett who is Emeritus Professor of Economics at the University of Florida started with the premise of earnable wages based on what Mr. Aretz was making at Thiokol in 1970—$8,247 as reflected by his income tax return for that year. I note that this was only a $200 increase over his 1969 earnings. Pl.Ex. 10. Dr. Blodgett calculated that Mr. Aretz would receive simple annual increases of over 17%. At a compound rate, the annual increase would be 4⅞%. He calculated plaintiff's total loss of earnings to date of trial at $102,431 which includes his employer's contributions to Social Security benefits, amounting to $5,547. Dr. Blodgett used the age of sixty-five (as well as seventy) as the span of plaintiff's work life. He fixed the loss of future earnings after date to that time, as reduced to present value, at $98,416. Tr. 230–235. The total of lost wages is $200,847, according to this witness.

The Government presented as its expert an experienced economist, Dr. David J. Farber who is employed in the Department of Labor at Washington. Using Social Security data as one of his predicates, he concluded that the total loss of wages from 1971 to the age of sixty-five, as reduced to present value at 7%, would have been $128,893. (Tr. 324–326).

■ As trier of the facts, this Court is not bound to accept the conclusions of expert witnesses even when they are undisputed. *Bradshaw v. United States, supra,* 143 U.S.App.D.C. at 356–57, 443 F.2d at 771–72. I respect and have considered such evidence in this case. Generally, however, expert testimony must be taken *cum grano salis* when it involves predictions as to what will happen in a person's economic future. Expert testimony is frequently based on published government and business reports and statistics regarding labor conditions and wages in various industries; inflationary adjustments and hypothetical increases of pay, and on assumptions and extrapolations. It is apt to be governed more by theory than the practicalities of the particular situation.

■ Mr. Aretz' income had been small prior to 1969. He possessed no special skills in any calling. In 1969 he was employed by Thiokol as a laborer and subsequently became a quality control inspector. After the explosion, most of the plant closed for approximately six months for rebuilding purposes. Employment rose to nearly 500 in 1973. No more trip flares were produced. The phasing out of the war in Viet Nam led to further reductions in employment. By November, 1976 Thiokol employed only 150 persons. At that point, the facilities were purchased by a concern which engages in the manufacture of agricultural chemicals. The new industry employs, I am informed, around 300 persons.

Independently of the destruction of the trip flare facilities, this Court does not think it likely that employment at Thiokol would have been open to Mr. Aretz after 1973 in any department of the ordnance operations. At the time of his injury plaintiff was making $4.00 per hour plus a little overtime or $165–$170 per week. At that time the minimum wage requirement was $1.60 per hour. It was increased to $2.00 in 1974; $2.10 in 1975; $2.30 in 1976 and is now $2.60 per hour. It will be raised to $2.90 on January 1st.

It would have been difficult for him because of lack of a vocation or training to obtain employment equivalent to that at Thiokol. The vocational expert, Mr. Younse, testified that on the basis of his examination of the case file plaintiff was a "workaholic." Aretz is above average in intelligence. Assuming that he would have immediately obtained remunerative employment after the job at Thiokol ended (he was then fifty-six years old) and that his work life would have been terminated in 1982 at the age of sixty-five, he would have earned in the intervening years at least the applicable minimum wage. I think it would have been considerably more.

In a job market area such as Jacksonville it can reasonably be assumed that plaintiff could have found employment of some sort after leaving Thiokol. For the period of 1971–1973 I have used his earnings at the Woodbine plant which averaged around $8,100 per year. This has been done on the premise that if the explosion had not occurred he might have been retained as an employee at Thiokol until swords became plowshares and spears were changed to pruning-hooks.

The best this Court can do under the circumstances is to average out what it conceives the earnings of the plaintiff would have been in those years. I conclude that they would have averaged around $6,500 a year. I adopt that figure as the measure of the earnings lost by him from 1974 until October, 1982. The last three and one-half years of work expectancy is treated as future loss of income and reduced to present value.

## IX

### COMMENTS ON CERTAIN ITEMS OF THE AWARD

The amount allocated in the award to pain and suffering covers all of the familial components of that subject.

■ I have not given effect to the factor of inflation and the resultant depreciation in the value of the dollar. The Georgia appellate courts have not passed on the effect of inflation on awards of future dam-

ages. This Court doubts that they would hold that it can be considered. The Fifth Circuit reached that conclusion in *Johnson v. Penrod Drilling Company,* 510 F.2d 234, 241, cert. den. 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58. See also *Higginbotham v. Mobil Oil Corporation,* 545 F.2d 422, 434–35, rev'd on other grounds 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581.

■ In determining the amount of the loss of consortium, I figure that two people of the same age, each having a fifteen year life expectancy, probably have less chance of both attaining the age of seventy-five than one of them does. I have therefore used a joint life expectancy of twelve years from February, 1979. The value of consortium has been calculated at $5,000 a year. Such loss doubtlessly will continue through February 3, 1979, which is eight years after plaintiff was injured. From that point on, I treat loss of consortium as future damage. The loss suffered by Mrs. Aretz during that period, as reduced to present value, amounts to $32,608.70.

Plaintiff seeks recovery of medical and hospital expenses in the amount of $58,-893.51. Of this, Aetna paid only $56,724.74. The difference is probably accounted for by expenses incurred after the carrier stopped paying same. Plaintiff's computation is not seriously contested. In fact, there is a stipulation (Pl.Ex. 9) that the items are correct although not necessarily recoverable. Medical and hospital expenses will be awarded on the basis claimed.

■ The government's contentions as to comparative negligence raised in its answer and its brief have been considered. I find that under the circumstances Mr. Aretz was not negligent in remaining in the building a short time in a futile effort to extinguish the fire.

Defendant's assumption of risk defense is likewise without merit. Under Georgia law, the application of the doctrine requires that there be a reckless testing of an observed and clearly obvious danger. *Atlantic Coast Line Railroad v. Street,* 116 Ga. App. 465, 157 S.E.2d 793; *Mitchell v. Young Refining Corporation,* 517 F.2d 1036 (5th Cir.). The evidence in support of the defense falls completely short of the legal standard in both law and fact.

## X
## ■ AWARD OF DAMAGES

### Thomas F. Aretz

| | | |
|---|---|---|
| 1. | Pain and Suffering, past and future | $400,000.00 |
| 2. | (a) Loss of earnings from February, 1971 to February, 1979 | $ 57,940.00 [6] |
| | (b) Loss of earnings for three and one-half years, February, 1979 to sixty-fifth birthday, Oct. 9, 1982, reduced to present value | $ 18,970.00 |
| 3. | Loss of contributions by employer to Social Security fund | |
| | (a) To February, 1979 | $ 3,248.70 [7] |
| | (b) February, 1979 to October 9, 1982, reduced to present value | $ 1,234.00 |
| 4. | Medical and hospital expenses | $ 58,893.51 |
| | Total damages suffered by Mr. Aretz | $540,286.21 |

### Less

| | |
|---|---|
| Set-off or credit to United States for veterans disability benefits paid to date | $ 18,622.41 |
| Net award to Mr. Aretz | $521,663.80 |

### Mrs. Eleanore H. Aretz

| | |
|---|---|
| (a) Loss of consortium to February 3, 1979 | $ 40,000.00 |
| (b) Loss thereof for twelve years after that date reduced to present value | $ 32,608.70 |
| Total award to Mrs. Aretz | $ 72,608.70 |

TOTAL OF AWARDS TO PLAINTIFFS $594,272.50

In one or two instances the above calculations in respect to past and future earnings and reduction to present value may not be precisely accurate. In any event, however, they are fair and reasonable in my opinion. At best, determinations of future earnings in disability cases are little more than informed approximations. No changes in the awards will be made by this Court except in the case of gross or palpable miscalculation.

---

**6.** In view of the very small likelihood of change over the next five months I have treated the period between now and February, 1979 as loss of past earnings.

**7.** The percentage of contribution by employers varied during the period. They were in 1971–72, 5.2%; 1973–77, 5.85%; 1978, 6.5%. The latter percentage has been used after 1978.

**412**

## ORDER

This Opinion constitutes compliance with Rule 52(a) and formal findings of fact and conclusions of law will not be made.

Let judgment be entered against the United States in accordance with the Findings and Conclusions in this Opinion in the total amount of $594,272.50, together with costs other than any attorney's fees. 28 U.S.C. § 2412. The judgment will draw interest at 4% per annum. 28 U.S.C. § 2411(b). It shall constitute a final judgment.

No appeal bond is required of the United States under the statute. 28 U.S.C. § 2408; *Switzer v. Marzall,* 95 F.Supp. 721 (D.D.C.).